Filed 9/22/16  P. v. Vasquez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>AGUSTIN VASQUEZ,<br><br>    Defendant and Appellant. | F069281<br><br>(Kings Super. Ct. No. 13CM8743)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Steven D. Barnes, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Rachelle Newcomb, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Agustin Vasquez was charged and convicted of count I, sexual penetration of a minor over the age of 14 years old by means of force (Pen. Code, § 289, subd. (a)(1)(C));[1] count II, sexual battery (§ 243.4, subd. (a)); and count III, misdemeanor annoying or molesting a child (§ 647.6, subd. (a)(1)). The victim was his 16-year-old goddaughter, who testified that defendant entered her bedroom at night, touched her vagina, and penetrated her genital area. Defendant denied her accusations and claimed he just gave her a massage. He was sentenced to eight years in prison.

On appeal, defendant contends the court should have granted his motion to exclude his pretrial statements to a police officer because he requested a Spanish interpreter, he was not provided with a translator, the officer conducted the interview in English, he did not knowingly and intelligently waive his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and his statements were involuntary.[2]

Defendant also contends his conviction for count I, sexual penetration of a minor with force, must be reversed because there is insufficient evidence of penetration as required by statute. In a related argument, defendant asserts the court had a sua sponte duty to instruct the jury on attempted sexual penetration as a lesser included offense of count I, and substantial evidence supported the instruction because of the victim's inconsistent statements about the nature and extent of the touching.

Defendant further argues the court should have granted his motion for new trial, based on trial counsel's alleged ineffectiveness for failing to impeach the victim with her pretrial statements to the police.

Finally, defendant contends the court should have stayed the sentence imposed for count II pursuant to section 654.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] Defendant used a Spanish interpreter throughout the criminal proceedings.

2

We will modify defendant's sentence and otherwise affirm.

## FACTS

In 2013, Sonia M. was 16 years old. She lived in Avenal with her mother, two brothers, and younger sister.

Defendant was Sonia's godfather. Sonia testified that defendant was like a second father to her family after their own father left them. Sonia testified defendant was at their house two or three times a week. Sonia and defendant spoke to each other in both English and Spanish.

Defendant often stayed overnight at Sonia's house, and slept on the couch. Sonia testified defendant and her mother were friends, but they did not appear to have a romantic or sexual relationship. Everyone in the family got along with defendant. He never touched or flirted with Sonia. Sonia occasionally saw defendant with various girlfriends.

**The night of the incident**

On the evening of May 16, 2013, defendant was at Sonia's house. Sonia was there with her mother and siblings. Everyone ate dinner together. Sonia's mother worked a nightshift and left for work. Defendant stayed at the house after she left.

Sonia testified there was nothing wrong that night. Sonia further testified defendant had never given her a massage, she did not need a massage that day, she did not ask him for one, and she did not ask him to touch her. She had never seen defendant give massages to her mother or siblings.

Sonia and her six-year-old sister shared a bedroom, and they went to bed around 10:47 p.m. Sonia was wearing underwear, loose-fitting pajamas, and socks. Sonia's bed was closest to the door. The bedroom door was closed when Sonia fell asleep.

3

## The sexual assault

Sonia testified she woke up in bed when she felt someone touch the skin of her leg, under her pajamas. There was a light outside her bedroom window, and Sonia saw defendant standing in front of her bed. Her bedroom door was open. Sonia testified it was unusual for defendant to be in her bedroom.

Sonia testified defendant sat on her bed. Defendant put both his hands through the leg openings of her pajamas and touched her legs. He moved his hands up both of her legs, under her pajamas. Sonia used her right hand and tried to flick away defendant's hand from her body. Defendant did not stop, and continued to move his hands up her legs and toward her underwear.

## Sonia's testimony about penetration[3]

### *Direct examination*

On direct examination, Sonia testified defendant continued to touch her legs, and he moved his hands under the leg openings of her underwear. She felt his hand inside her underwear, and felt his bare skin touch her bare skin.

---

[3] The prosecution's theory in support of count I, sexual penetration of a minor by force, was that defendant penetrated Sonia's vagina with his finger.

On May 17, 2013, Sonia was interviewed by Avenal Police Officer Vargas about what defendant did to her the previous night. As we will discuss in issue II, *post*, defendant contends on appeal there is insufficient evidence to support count I because Sonia gave inconsistent statements at trial, and in her pretrial statement to Vargas, as to whether defendant penetrated her vagina. In issue IV, *post*, defendant argues his motion for new trial should have been granted because defense counsel was prejudicially ineffective for failing to cross-examine Sonia about inconsistencies between her pretrial statement to Vargas and her trial testimony, about whether defendant penetrated her vagina. In order to address these issues, we must extensively review the Sonia's direct and cross-examination testimony at trial about how and where defendant touched her body.

4

In response to the prosecutor's questions, Sonia testified defendant touched her "private part," and said that was the same area that she wiped herself after urination. Sonia testified defendant touched her private part with his hand.

Sonia testified that as defendant touched her "private part," she again tried to flick his hand away from her body. She also spoke to him in Spanish and told him to leave her alone. However, defendant did not stop and continued to touch her. Sonia testified she did not call for help or try to leave her bedroom because "I was scared and I didn't know what to do."

The prosecutor presented Sonia with a diagram which showed drawings of a person's front and back. The prosecutor asked Sonia to mark the diagram to show where defendant touched her body. The prosecutor presented Sonia with a second diagram which showed a female's "private part," and asked her to mark the area where defendant touched her. Sonia drew a circle, and testified defendant touched her "inside" the circle that she had just drawn.

"Q. Do you know the name of the body part that you just saw, the People's Exhibit 2?

"A. Yeah.

"Q. *What is the name of the body part?*

"A. *The vagina.*

"Q. *And was your vagina touched?*

"A. *Yeah.*

"Q. *And how was it touched?*

"A. *What – with the hand.*

"Q. *With the defendant's hand?*

"A. *Yeah.*

5

"Q. *Did you feel his hand bare skin touching your bare skin?*

"A. *Yeah.*" (Italics added.)

Sonia testified no one else had ever touched her private part or vagina. She did not like how it felt.

### Cross-examination

On cross-examination, defense counsel asked Sonia about where defendant touched her.

"Q.     … And you are saying that [defendant] touched you in a private part?

"A.    Yes."

Defense counsel turned to Sonia's pretrial statement to Officer Vargas about the incident, and asked her what she told Vargas.

"Q.    [Officer Vargas] asked you if [defendant] put his finger inside, and I know there's a picture here and it's People's Exhibit 2, and I'm going to show you…. [¶] I'm going to show you People's Exhibit 2. Did – do you remember if the officer showed you a diagram picture just like this?

"A.    Yeah.

"Q.    *Okay. And do you remember if [Vargas] asked you if [defendant] put his finger inside?*

"A.    *Yeah.*

"Q.    *We'll call it 'vagina,' the word they use here; do you remember that?*

"A.    *Yeah.*

"Q.    *And do you remember saying no.*

"A.    *Yes.*

"Q.    And [Vargas] asked you again and you said yes; do you remember that?

6

"A.     No."**4**  (Italics added.)

Defense counsel next asked Sonia if Officer Vargas asked her if defendant put his hands "inside" her "opening," and whether Sonia said yes.  Sonia testified that she said yes to Vargas.

"Q.     Okay.  And then [Vargas] asked you the same question again just a little while later and you said that you weren't sure?

"A.     I don't remember.

"Q.     Do you remember that?  Okay.  When he asked you if he touched any part of this and you said 'I'm not sure I think yeah'?

"A.     I don't remember."

After additional questions, defense counsel returned to the subject of Sonia's prior statement to Officer Vargas.

"Q.     And during that incident when you spoke to the officer, did you tell him that [defendant] put his finger inside your private part?

"A.     I don't remember.

"Q.     I'm sorry?

"A.     I don't remember.

"Q.     You don't remember?

"A.     Huh-uh.

"*Q.     Okay.  Did [defendant] put his finger inside your private part?*

"A.     *I don't remember.*"  (Italics added.)

---

**4** As we will discuss in issue IV, *post*, defendant argues his new trial motion should have been granted based on defense counsel's alleged ineffectiveness for purportedly failing to introduce Sonia's statement to Vargas, that defendant did not put his finger in her vagina.

Defense counsel asked Sonia if she remembered that Officer Vargas asked her several times if defendant's finger went inside her private part, and she said yes and then said she did not know. Sonia testified that she remembered being asked the question, but she did not remember her answer.

Sonia testified she did not know why she did not remember what she told Vargas. Defense counsel asked if she lied to Vargas. Sonia said she was not lying, she remembered things better at the time it happened because time had passed, and since then "I will talk about this to no one."

Defense counsel showed Sonia the transcript of her interview with Officer Vargas, asked her read a certain portion, and asked if that refreshed her memory about whether she said defendant put his finger in her private part. Sonia testified it did not help refresh her memory. Sonia again testified she told the truth to Vargas.

### *Redirect examination*

On redirect examination, the prosecutor returned to the question of where defendant touched Sonia.

"Q. … What part of the defendant's body touched your vagina?

[¶] … [¶]

"A. Um, his palm.

"Q. His palm? And why did you think that it was his palm that touched your vagina?

"A. Because – I don't know.

"Q. Is that how you felt?

"A. Yeah."

The prosecutor asked Sonia to look at the diagram shown in Exhibit No. 2, and whether defendant's palm "made contact" with the area she had circled. Sonia said yes.

8

Sonia testified she told the truth to Officer Vargas, but she was nervous and scared during the interview because the incident had "barely happened." She did not tell Vargas every single thing that happened that night.

The prosecutor again asked Sonia how defendant touched her:

> "Q. *Now to clarify, did the defendant touch you in the vagina?*
>
> "A. *Yes.*" (Italics added.)

***Recross-examination***

On recross-examination, defense counsel immediately asked Sonia to explain her last answer to the prosecutor, that defendant touched her in the vagina:

> "Q. Sonia, the prosecutor just asked you if [defendant] touched you in the vagina and a little while ago you said you didn't remember and I showed you documents and you still didn't remember saying no and right now you just said yes he did. Is there something that happened right now between the time I asked you and the time the prosecutor asked you that triggered your memory?
>
> "A. I don't get your question because you like you talk really fast.
>
> "Q. I'm sorry?
>
> "A. I don't get your question.
>
> "Q. You didn't understand my question?
>
> "A. No.
>
> "Q. And so when [the prosecutor] said 'touch you in the vagina' you said yes without hesitation?
>
> "A. Yeah.
>
> "Q. Did you just say that because [the prosecutor] asked it that way or because [defendant] actually … [¶] touched you inside your vagina?
>
> "A. *He did touch me.*
>
> "Q. Oh, he did?

9

"A.    Yeah, but you were asking me another question.

"Q.    Okay.  But when the officer asked you you said he didn't, do you remember that?

"A.    No."  (Italics added.)

Defense counsel asked Sonia whether she saw defendant's palm touch her vagina. Sonia said no.

## After the sexual assault

Sonia testified the entire touching definitely lasted longer than a minute, but she could not say whether it lasted longer than five minutes.  The touching of her vagina lasted longer than 30 seconds, but she could not say whether it lasted longer than one minute.  Sonia just estimated the time because she was not looking at a clock.

Defendant did not say anything as he touched her.  He did not make any sounds, and he did not touch himself during the incident.  He never held her down.  He did not threaten her.  He did not tell her not to tell her mother or her brothers.

Sonia testified no one had touched her like that before, and it was not a massage.

At some point, defendant stopped touching Sonia.  He told her to wake him up in the morning so he could take the children to school.  Sonia did not reply because she did not want to talk to him.  She was scared because no one had touched her like that before, and she did not like it.

Defendant walked out of Sonia's bedroom and left the door open.  Sonia got up from her bed, and closed and locked the bedroom door so he could not return.  She sat on the floor and cried, and then returned to bed and cried.  Sonia testified her younger sister was in the bedroom during the entire incident.  Sonia believed her sister slept through it. Sonia did not wake her because she did not want her sister to become scared.

At some point that night, Sonia sent text-messages to her boyfriend, who lived near Sacramento.  She told him that defendant touched her inappropriately.  After she texted with him, she fell asleep.

10

**The next morning**

The next morning, Sonia helped her sister get dressed for school. Sonia asked her younger brother if defendant was still there, and he said yes. Defendant had slept on the couch as usual. Sonia stayed away from the living room and kitchen because she did not want to see defendant.

Defendant took Sonia's two younger siblings to school. Sonia locked the front door after they left because she did not want defendant to come back. Sonia took a shower and waited for her mother to get home. Her 18-year-old brother was still asleep. She did not tell her older brother what happened because she didn't talk to him "like that so I didn't know how to tell him."

In the morning, however, Sonia's boyfriend contacted her older brother. Her brother asked Sonia if it happened, and Sonia said yes. Sonia cried and her brother hugged her. Sonia and her brother woke up their mother and told her what happened.

**Sonia's interview with Officer Vargas**

On May 17, 2013, Officer Vargas conducted a recorded interview with Sonia about what defendant did to her the previous night. Neither the prosecution nor the defense introduced before the jury the recording or the transcript of Vargas's interview with Sonia. As set forth above, however, defense counsel used the transcript to cross-examine Sonia about alleged inconsistencies between her statements to Vargas and her trial testimony.

In addition to the cross-examination discussed above, defense counsel also elicited from Sonia that she never told Officer Vargas that she had a boyfriend or she texted him about the incident. Sonia told Vargas that she told her brother about the incident, but she did not tell Vargas that her boyfriend told her brother. Sonia testified she told Vargas that it was midnight when defendant started touching her, because her cellphone was next to her and she looked at it when she woke up. She told Vargas that defendant touched

11

her for about an hour because she looked at the clock when he left her bedroom. She never told the officer that she locked the bedroom door after defendant left.

**Defendant's pretrial statements**

Officer Vargas testified that after he interviewed Sonia, he contacted defendant the same day at his workplace at Harris Ranch Restaurant in Coalinga. He drove defendant to the Avenal Police Department, and conducted a recorded interview for one hour. He advised defendant of the *Miranda* warnings in English.[5] Vargas testified defendant understood his rights, and answered his questions in English. Vargas testified he did not use an interpreter because he did not feel one was needed, and he was able to communicate with defendant in English.

Officer Vargas testified he never felt there was any miscommunication or misunderstandings with defendant during the interview. Whenever defendant had questions, Vargas took time to go over the questions methodically "so he would understand exactly what I was asking him." Vargas testified there were times he went

_____

[5] As we will discuss in issue I, *post*, defendant moved to exclude his pretrial statements to Vargas. Defendant argued his statements were obtained in violation of *Miranda* and involuntary because defendant asked for a Spanish translator but Vargas failed to provide an interpreter, advised him of the *Miranda* warnings in English, and questioned him in English. The court listened to the entire recording and denied the motion to exclude. At trial, both the prosecutor and defense counsel used the transcript of the interview when they questioned Vargas and defendant about his pretrial statements. The parties did not move to introduce the recording or the transcript of the Vargas/defendant interview into evidence before the jury. However, these materials are part of the appellate record because the trial court and the parties agreed to lodge into the trial record the transcript and CD with the audio recording for purposes of review, and this court granted defendant's motion to augment the record with these items. We will fully address that interview in issue I, *post*.

As we will discuss in issue IV, *post*, the same CD also contained the audio recording of Officer Vargas's interview with Sonia, and the front of the CD states that it contains both interviews. The recording was not introduced into evidence before the jury, but defendant relied on portions of that interview in support of his motion for new trial.

12

back and re-asked questions to make sure defendant "understood exactly what I was asking before he answered." Vargas further testified it was very common to repeatedly ask the same questions even to an English-speaking subject.[6]

Officer Vargas testified that in response to his questions, defendant said Sonia was his goddaughter and he went to the family's house two or three times a week. He usually slept on the sofa. Defendant thought Sonia was 17 years old.

Officer Vargas testified that defendant said he was at Sonia's house the previous night, on May 16, 2013, and Sonia and her siblings were there. Defendant said he gave Sonia a massage to relax her. Defendant initially said he massaged from her neck down to her feet. The skin of both his hands touched her body. Defendant said he also massaged her thighs and "pretty much her whole leg area."

Officer Vargas asked defendant if he touched her groin area. Defendant said it was possible that he touched her vagina while touching her upper thigh. Vargas asked defendant if he touched Sonia between her legs. Defendant said yes. Vargas asked defendant if was possible that his DNA was on her panties. Defendant said it was a possibility.

Officer Vargas asked defendant if he thought it was appropriate for a 49-year-old man to give a massage to a minor female. Defendant initially said he did not know. Defendant then said he did not feel it was appropriate to do so on her bed in her bedroom.

***Cross-examination of Officer Vargas***

On cross-examination, defense counsel asked Officer Vargas if defendant repeatedly denied that he touched Sonia's vagina. Vargas testified defendant said it was possible he touched her vaginal area. After reviewing the interview transcript, Vargas

---

[6] In issue I, *post*, we will extensively review the transcript of Officer Vargas's interview with defendant, and find that defendant validly waived his Fifth Amendment rights and his statement was voluntary.

testified he asked defendant several more times whether he touched her vagina. Defendant said he did not put his hands on her vagina. Vargas testified he repeatedly asked these questions to clarify and make sure defendant understood. Vargas never felt there was a language barrier where defendant could not understand his questions.

Defense counsel asked Officer Vargas if defendant denied that he touched Sonia between the legs. Vargas testified defendant initially denied it. Later in the interview, Vargas again asked defendant where he touched Sonia's body. Vargas asked defendant to demonstrate, and defendant "actually touched his own body indicating where he pointed and his hands did touch the inner side of his legs, and he indicated to me where he massaged her." Vargas testified that when his questions became more "interrogational," defendant denied touching her buttocks or between the legs.

On redirect examination, Officer Vargas testified he repeatedly asked defendant if he touched Sonia's vagina. Later in the interview, defendant said it was a possibility.

## DEFENSE

Teresa Rodriguez, Maria Jauregui, and Iba Biggs testified they had known defendant for years, and he was a good and hardworking man. Their children had been around him, and they never saw him act inappropriately against children or anyone else.

### Defendant's trial testimony

Defendant testified he was 49 years old and had lived in the United States for over 35 years. He went to high school for six months. At the time of his arrest, he was working at a taco shop in Huron. He spoke Spanish and English to the customers but he could not hold a conversation in English. He also worked at Harris Ranch Restaurant as a food runner to serve the tables. He had worked at Harris Ranch for 33 years, and he was trained to do his job in Spanish. He spoke to the customers in Spanish and English.

14

Defendant testified he had known Sonia's mother for many years but they did not have a romantic relationship. Defendant said he spoke English "between 10 and 15 percent." He understood "some things, there are other things I do not understand." He always spoke Spanish to Sonia's mother and his own children. Sonia was his goddaughter, and he felt that she was his daughter. He frequently stayed overnight at the house and helped take the children to school.

Defendant testified it was normal for him to massage people. He had previously given massages to Sonia's mother and brothers. On previous occasions, he gave massages to Sonia in the living and dining rooms, but he had never done so in her bedroom.[7]

Defendant said he did not feel any sexual gratification from giving massages. He also gave massages to both male and female coworkers if they wanted them. He was not trained and had never been paid to give massages.

Defendant testified that on May 16, 2013, he went into Sonia's bedroom at 11:57 p.m. He had heard her slamming doors earlier in the night, and there had been an argument between Sonia's mother and another person. Defendant knocked on Sonia's bedroom door because he was going to tell her to wake him up in the morning so he could take the children to school. Her younger sister was asleep in bed. Both defendant and Sonia were fully clothed and standing up. He asked if she wanted something to eat. Sonia seemed nervous. Defendant asked if she wanted a massage. He did not have any sexual purpose.

Defendant testified Sonia laid on the bed on her right side, with her back towards the outside of the bed. He massaged her from her temples down to her feet, and skipped her buttocks. He did not touch her breasts, vagina, or buttocks, and he never reached

---

[7] Sonia testified defendant had never given her a massage, and she had never seen him give massages to her mother or siblings.

under her pajamas or underwear. She never pushed him away or said anything. She did not act uncomfortable. The bedroom door was open; she never tried to walk or run away from him. He did not use force or threaten her.

Sonia's sister did not wake up during the massage. He massaged Sonia for three or four minutes.

When he finished the massage, he told Sonia to wake him in the morning so he could take the children to school. Defendant said goodbye. He pushed the button lock to her bedroom door and closed it. He went to sleep on the sofa. In the morning, he took the younger children to school and never saw Sonia.

Defendant testified that when he was interviewed by Officer Vargas, he explained that he spoke Spanish and asked for an interpreter. Vargas promised to get an interpreter but never produced one. The entire interview was conducted in English.

Defendant testified he understood about 40 percent of the interview, but he could not understand approximately 60 percent of the interview. He did not feel well "because I couldn't express myself as I'm doing now," since he used an interpreter at trial.

Defendant testified he told Officer Vargas several times that he did not touch Sonia's vagina. Vargas asked if he massaged Sonia for sexual reasons. Defendant said no. He did not think Vargas understood him.

## DISCUSSION

### I. Admission of Defendant's Pretrial Statements

Defendant contends the court should have granted his motion to exclude Officer Vargas's testimony about defendant's pretrial statements because he did not understand English, he asked for a Spanish translator at the beginning of the interview, and a translator was not provided. Defendant argues his *Miranda* waiver was invalid and his statement was involuntary because Vargas advised him of the *Miranda* warnings in English and the entire interview was conducted in English.

16

*A. Miranda and Voluntariness*

We begin with the well-settled principles about *Miranda* waivers and voluntariness. "*Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]" (*Moran v. Burbine* (1986) 475 U.S. 412, 421; *People v. Combs* (2004) 34 Cal.4th 821, 845.)

"[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. [Citation.] We have recognized that a valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or a refusal to talk bars further questioning. [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 667–668 (*Cruz*).)

In addition, " '[a]n involuntary confession is inadmissible under the due process clauses of both the Fourteenth Amendment to the federal Constitution [citation] as well as article I, sections 7 and 15 of the California Constitution [citation].' [Citation.]"

17

(*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1400–1401.) " 'The due process [voluntariness] test takes into consideration "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." ' [Citation.] This test 'examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093, overruled on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

The prosecution bears the burden of establishing, by a preponderance of the evidence, that the suspect's *Miranda* waiver was knowing and intelligent, and that his statement was voluntary and not obtained in violation of due process. (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1093; *People v. Whitson* (1998) 17 Cal.4th 229, 248; *People v. Bradford* (1997) 14 Cal.4th 1005, 1034.) On appeal, we conduct an independent review of the trial court's legal determinations, and rely on its factual findings on disputed facts if supported by substantial evidence. (*People v. Williams* (2010) 49 Cal.4th 405, 425; *People v. Holloway* (2004) 33 Cal.4th 96, 114; *People v. Bradford*, *supra*, 14 Cal.4th at pp. 1032–1033.)

When an interview is tape-recorded, the facts surrounding an admission or confession are undisputed, making the issue subject to our independent review. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176–1177.)

With this background in mind, we turn to the court's evidentiary hearing on the admissibility of defendant's statement, the actual recording of the interview, and the court's ruling that his *Miranda* waiver was knowing and intelligent, and his statement was voluntary and admissible.

B. *Officer Vargas's Hearing Testimony*

When the prosecution moved to introduce defendant's pretrial statements to Officer Vargas, defense counsel objected and argued defendant's statements were

18

obtained in violation of *Miranda* and involuntary because he was interviewed in English even though he requested a Spanish interpreter before the interview, and he needed an interpreter for the criminal proceedings. Counsel argued defendant "stumbled" through the interview, he never understood the *Miranda* advisement or the questions that were asked, and his statements should be excluded.

The court conducted an evidentiary hearing pursuant to Evidence Code section 402 to address the issue. Officer Vargas was the only witness; defendant did not testify. As noted above, the court and the parties agreed to lodge the transcript and the CD with the audio recording of the interview into the record, and we granted defendant's motion to augment the appellate record with those materials.

Officer Vargas testified that he advised defendant of the entirety of the *Miranda* warnings in English from his department-issued card. After reading the rights, Vargas asked defendant if he understood. Vargas testified that the transcript stated that defendant replied in Spanish. However, Vargas recalled that defendant's reply was " 'mas o menos.' " Vargas testified that he knew that meant "more or less."

Officer Vargas testified that he asked defendant what he did not understand, and that he could explain it to him. Vargas testified defendant said he did not want to answer in English because his first language was Spanish. Vargas asked how long he had been speaking English. Defendant said it had been nine or 10 months, since he had become a server. Defendant said he knew basic English, but he had never studied English.

Officer Vargas testified he did not attempt to find a Spanish interpreter because defendant's answers "were very articulate with my questions and they were very consistent and if I felt like I needed a Spanish speaking translator I would have got one."

Officer Vargas testified he told defendant they would give it a try in English. He again read the *Miranda* warnings to defendant in English, and this time he read them line-by-line. In response to each advisement, defendant said he understood.

19

Officer Vargas then began asking questions about the investigation. Vargas testified defendant answered the questions in English, his speech was coherent, he answered in complete sentences, and his answers were responsive to each question.

After hearing Officer Vargas's testimony, the court stated that it wanted to listen to the recording of the entire interview to determine "if the defendant truly does not understand enough English to understand the *Miranda* warnings that were given to him in English," and whether "there's a substantial probability that he didn't understand them." The parties stipulated that the court could listen to the audio recording of the entire interview and review the transcript in chambers.

*C. Officer Vargas's Recorded Interview with Defendant[8]*

The recording reflects that Officer Vargas and defendant spoke English for nearly the entirety of the interview. There are limited sections where defendant and Vargas spoke Spanish; the transcript does not include what defendant said in Spanish or translate.

At the beginning of the interview, Officer Vargas said he was with the Avenal Police Department, and asked defendant if he was okay and if he wanted something to drink. In the course of this initial exchange, defendant said he had worked for Harris Ranch for 32 years.

Officer Vargas read the entirety of the *Miranda* warnings to defendant in English, without taking a break as he read each sentence, and asked defendant if he understood.

---

[8] The trial court listened to the entirety of the audio recording of Officer Vargas's interview with defendant to determine whether defendant's statements should be excluded as obtained in violation of *Miranda* and involuntary. This court has also listened to the entirety of the audio CD of the interview to address defendant's appellate contentions, and we have quoted from relevant portions of the transcript.

At trial, the parties did not introduce any part of the audio recording or the transcript into evidence before the jury. However, the parties used limited excerpts from the transcript to question Vargas and defendant when they testified.

The transcript states that defendant replied in Spanish, but does not state the Spanish words or offer a translation.

As explained above, however, Officer Vargas testified at the evidentiary hearing that defendant's Spanish reply was " 'mas o menos,' " which Vargas interpreted as meaning "more or less."

Officer Vargas asked defendant, "What don't you understand? I can explain it to you." Defendant said, "My, my, I, if you don't ha--, you don't, question I was gonna a--, I wanna answer the right answers, uh," and "Uh, I don't wanna answer in English because I, for my first language is Spanish. You know what I mean?"

Officer Vargas asked defendant how long he had been speaking English. Defendant said since he became a "server" for "like nine months, ten months. I was, I was a food runner before."

> "[Defendant:]    So, to c-, to be on (inaudible) people because uh, my English is not…
>
> "Vargas:    Your English is very good.
>
> "[Defendant]:    Yeah, it's it's pretty good (inaudible)
>
> "Vargas:    It's longer than nine months.
>
> "[Defendant]:    But sometimes when they, when they ask me some, some questions I'm not sure like, you know?
>
> "Vargas:    Well, I'll try to explain it…
>
> "[Defendant:]    I know most of the basic English…
>
> "Vargas:    Okay.
>
> "[Defendant:]    Because I never study Eng--, English."

Officer Vargas told defendant he would "make sure and explain what I, what I ask … slowly so, you'll understand it." Defendant replied: "Okay, perfect."

21

"Vargas: If you don't understand … you can just … just ask me that, if you have any further questions…

"[Defendant]: Mm hmm.

"Vargas: And I can get somebody that speaks Spanish to explain it in Spanish if you need it. Okay?

"[Defendant]: I probably feel more comfortable with it.

"Vargas: *Okay, we'll, we'll give it a try with English and if you need a Spanish, uh translator…*

"[Defendant]: (inaudible) okay.

"Vargas: *We can do that for you … we have a Spanish officer on duty and they can help me out a little bit.*"  (Italics added.)

Officer Vargas asked defendant whether he understood the rights he had read to him.  Defendant replied, "What are my rights?"

Vargas then read and explained each right separately:

"Vargas: Okay, you have the right to remain silent, okay? Do you understand?

"[Defendant]: What is that?

"Vargas: You have the right to remain silent.  That means you have the right to, not to talk to me.

"[Defendant]: Oh, oh, okay.

"Vargas: Okay?  You, anything you say can and will be used against you in a court of law.  Anything that we talk about today can and it probably will be used in court later on, in the future if we go to court.

"[Defendant]: Yeah, I, I'm fine.

"Vargas: You understand?

"[Defendant]: I'm ready for it.  I'm available to, very good, yeah.

"Vargas: You unders-, you understand that?  Yes?

22

"[Defendant]:          Yeah, I understand that.

"Vargas:               You have the right to talk to a lawyer and have him present with you while you're being questioned.  You know what a lawyer is?  You don't know what a lawyer is?

"[Defendant]:          A lawyer, yeah.  Defender, uh …

"Vargas:               Yeah.  You have a right to have a lawyer and have him with you before any questioning …

"[Defendant]:          Mm hmm.

"Vargas:               If you wish.  If you cannot afford one, if you have no money to pay for a lawyer, one will be given to you for free.

"[Defendant]:          That's good.

"Vargas:               So, you don't have to worry about …

"[Defendant]:          That sounds good.

"Vargas:               No, paying any bills.  You understand?

"[Defendant]:          Uh huh.

"Vargas:               M'kay.  So, you understand your rights, yes?

"[Defendant]:          I understand my rights."

Officer Vargas asked defendant for personal information, and defendant answered the questions in English without hesitation.  Defendant said he worked at Harris Ranch in Coalinga, gave his street address and telephone number, and said he had lived there for more than 10 years.  His mother lived in Lemoore, his siblings lived in Fresno and Clovis, his wife lived in Mexico, and his son lived at Harris Ranch.

Defendant said he was a food runner and server at Harris Ranch and also worked at Chris Meat in Huron.

Defendant said he worked and went to church.  Officer Vargas asked if he did anything else.  Defendant said he sometimes visited someone in Avenal, and used a

23.

Spanish word. Vargas replied in Spanish, and asked defendant if he meant he visited his goddaughter, Sonia. Defendant said yes. Vargas asked if he knew what a godfather was. Defendant said he presented Sonia when she was baptized.

Officer Vargas asked defendant if he knew Sonia's age. Defendant thought she was 17 years old. Vargas asked for the name of Sonia's mother, defendant identified her, and said Sonia's family lived together in the same house. Vargas asked how often he visited them. Defendant said two or three times a week, and sometimes Sonia's mother called and invited him over, and he would bring over hamburgers.

Officer Vargas asked defendant about what happened the previous night at Sonia's house. Defendant said he slept on the sofa in front of the television. Vargas asked who else slept in the house that night. Defendant said Sonia and her three siblings, and identified each child.

Officer Vargas asked defendant if anything unusual happened while he was sleeping on the couch. Defendant responded in long, narrative paragraphs in English. He said Sonia "came in" and told him that she could not sleep. Defendant heard noise coming from her room, and she had closed the bedroom door hard three times. Defendant said an hour later, he went to check on Sonia, and she opened her bedroom door. Defendant asked her to set the alarm so he could take the kids to school in the morning. Defendant asked Sonia what her problem was and why she couldn't sleep. Sonia said "she has some problems with being uh, angry. She's angry." Defendant asked if she wanted a hamburger. Sonia said she was okay and would go to sleep.

Defendant said he asked Sonia if she wanted to relax and needed a massage. Defendant said he gave her a massage, she relaxed, and he went back to the sofa and went to sleep.

Officer Vargas asked where defendant massaged her. Defendant said "practically … the whole body," and from "the neck to the toe." Vargas asked, "And everything in

24

between?" Defendant said no. Vargas asked if he used his hands; defendant said yes. Vargas asked if she was wearing clothes; defendant said yes. Vargas asked if he touched her skin. Defendant said, "From maybe there." Vargas clarified, "From the feet?" Defendant said, "[Y]eah, from the head right there …."

Officer Vargas asked defendant if he touched Sonia's knee, thigh, head and arms. Defendant said yes, and it was just a massage. Vargas asked if he pulled up her pants legs. Defendant said, "Just a little." Vargas asked if he put his hands under her pants. Defendant said no. Defendant said he touched her arms and head just to "relax her."

Officer Vargas asked defendant if he ever touched Sonia's "groin area." Defendant said, "Not right there." Vargas asked defendant to show him what the groin area was. Defendant apparently gestured and said he thought "that was like this," and "from here to the back."

Officer Vargas asked defendant whether he thought it was appropriate for a 49-year-old man to give a massage to a minor. Defendant said, "If you do it … in a bad way, it's bad. Right?" Vargas again asked defendant if he thought it was appropriate to give a 16 or 17-year-old female a massage on her bed in her bedroom. Defendant said, "I think not."

Officer Vargas told defendant he investigated these types of crimes, and asked whether he touched "her thigh, her skin area, right here in this general area, did you touch that when you were massaging her?" Defendant said he did. Vargas asked if his hand touched her skin, and whether defendant understood what he meant. Defendant asked if he meant "[w]ith the hands." Vargas said yes. Defendant replied, "Yeah, yes I did, yeah."

Officer Vargas asked defendant how his hand touched the skin of her leg "right here? And I'm pointing to my thigh area," and if his hand went "up the pants" to "massage the leg?" Defendant said he did not remember. Vargas said he remembered

25

just a minute ago, and again asked if he touched Sonia's legs inside her pants. Defendant said yes. Vargas asked defendant if he pulled up her pants leg high so he could massage "this area" of her leg. Defendant said yes, but he did not get "close" and said she was wearing pants.

Officer Vargas asked defendant if he touched Sonia between her legs. Defendant said no, that he just gave her a massage over her pants.

Officer Vargas asked defendant if Sonia was wearing panties that night; defendant said yes. Vargas asked defendant if he knew what DNA was. Defendant said something inaudible and "that's the marks." Vargas said it was kind of like fingerprints. Defendant said that he understood. Vargas asked defendant if his "fingerprints, your D-N-A, is gonna be found on her panties." Defendant asked, "why does it have to be in the underwear?" Vargas told defendant that if he touched his shirt, his DNA would be found on the shirt. Vargas asked defendant if he understood. Defendant said yes. Vargas again asked defendant if his DNA would be found on her panties.[9]

> "[Defendant]:        I don't think so.
>
> "Vargas:             Is there a possibility?
>
> "[Defendant]:        Probably.
>
> "Vargas:             Probably, and why…
>
> "[Defendant]:        If you, if you (inaudible)

---

[9] There was no DNA evidence in this case. An officer's ruse or deception about physical evidence does not render a statement involuntary. (*People v. Maury* (2003) 30 Cal.4th 342, 411.) "Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal due process clause…. [¶] So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible in evidence. [Citations.]" (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280, italics in original.)

"Vargas:             Then why would there, why is there a possibility that your fingerprints would be on her panties during the massage?  Were you massaging her vagina?

"[Defendant]:       That's true."

Officer Vargas asked defendant what he meant, and whether he knew what a vagina was.  Defendant said he did not know.  Vargas gave a brief explanation of male and female anatomy, and there was another exchange in Spanish.

Officer Vargas asked defendant if there was a possibility he was massaging it, using a Spanish word.  Defendant said he did not know.  Vargas spoke Spanish and added in English, "That's a vagina," and that defendant knew what it was.  Defendant again spoke Spanish.  Vargas said, "That's a vagina, okay?  Did you touch her vagina yesterday, last night?"  Defendant said no.  Vargas again asked if he touched her vagina with his hands because the evidence would come back.  Defendant said that if "you got me like this, I'm, I'm not sure if you got, if you gotta make, if you gotta make contact.  I don't know…."

"Vargas:             You don't know if you made contact with her vagina?

"[Defendant]:       I don't, I, I'm, I'm…

"Vargas:             Is there a possibility?

"[Defendant]:       You know, I, I…

"Vargas:             You did?

"[Defendant]:       I don't remember that."

Officer Vargas asked why he could not remember.  Defendant replied, "Because I never made contact with it."  Defendant said he did not pay attention and the massage happened fast.  Vargas asked if he could have touched her vagina if he wasn't paying attention.  Defendant said he was being gentle and "going close."

27

Officer Vargas again told defendant that his perspiration could have been left on Sonia's clothes and body, and asked if there was a possibility "that you touched her vagina." Defendant said he did not do it "in a bad way." Vargas asked defendant why he touched her vagina. Defendant said, "I didn't touch her (inaudible)."

Officer Vargas asked why he didn't feel something bad if he touched her vagina. Defendant again said he did not touch her vagina, and asked Vargas if Sonia told him that. Vargas said the girl would not lie, and she was hurt because defendant had betrayed her, he could make things right, and asked why he touched her vagina and whether it was an accident. Defendant said, "Probably, I don't' know. That's, that's, I don't, I don't feel, I don't feel, if I touch it or not, I just, I just be like, like that …."

"Vargas: So, you went, you went in between the legs? You went between the legs?

"[Defendant]: Yeah, I be, I be like, like that and I just be like, like the whole, the whole, the whole back…."

Officer Vargas asked defendant why he touched her "down there." Defendant replied, "I don't touch right there. I, I'm telling you…." Vargas said defendant had already told him that earlier, and said he went fast during the massage. Defendant said he did not say he touched "in here." Vargas said it may not have been his intention or what his mind was thinking, but "you still probably touched her vagina."

"[Defendant]: Possibly?

"Vargas: A possibility?

"[Defendant]: There's a possibility, yeah."

As the interview concluded, Officer Vargas told defendant that he spoke and understood English very well. Defendant said he understood, but sometimes there were things he did not understand.

28

"Vargas:            But, for the most part, did I explain myself well?

"[Defendant]:       I understand you.

"Vargas:            I explained myself well, right?

"[Defendant]:       Yeah…

"Vargas:            Okay, so, you understood me?  Okay?

"[Defendant]:       I don't know what is the, um, the real situation? I don't understand it….

"Vargas:            Well, the real situation is you touched a female inappropriately, a minor.

"[Defendant]:    I understand that…."

*D. The Court's Ruling*

After the court listened to the recording of the entire interview, it found by a preponderance of the evidence that defendant's *Miranda* waiver was valid, and the entirety of his statement was voluntary.

"The Court initially had substantial doubts by listening to the parties' argument, however, listening to the audio the Court is convinced that considering the totality of all of the circumstances that the waiver of *Miranda* rights in this case was knowing, voluntary, and intelligent.  What was initially difficult for the Court was that the rights were read from the card and that the defendant indicated that it appeared to the Court he answered in a Spanish phrase which the Court understands but it's not going to translate for these proceedings.  The officer then went over the rights with the defendant one by one.  As the interview progressed, which goes on for approximately an hour, it's the Court's opinion that the situation's *where the defendant did not initially seem to understand the question or the words the officer was using, it was brought to the officer's attention and each one of those were explained.  So it's not a situation where the Court believes that the defendant answered the question yet actually had no knowledge of what the officer was asking so that there would be otherwise some confusion in that particular area.*

29

"So the Court would find that the confession was voluntary as well as there being an implied waiver …, and I would note as well there was no intimidation, coercion, no deception, and that considering the totality of all the circumstances the waiver was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it is clear from the auditory record that I reviewed that that is set forth. In addition, although there was some discussion with respect to providing the Spanish language interpreter, *there was no indication by the defendant that that should take place before any further statements be given*." (Italics added.)

*E. Trial Evidence*

During trial, Officer Vargas testified about defendant's statement. The prosecution did not introduce the audio recording or transcript of the interview. On cross-examination, defense counsel extensively asked Officer Vargas about whether defendant understood his questions. Counsel asked Vargas to review the transcript, and Vargas testified that he initially advised defendant of the *Miranda* warnings in English, defendant responded in Spanish, defendant said Spanish was his first language, and defendant said he felt more comfortable talking in Spanish. Vargas testified he spoke a little Spanish but he continued the interview in English.

The prosecutor objected to defense counsel's questions on this subject. The court allowed defense counsel to continue. In response to additional questions, Officer Vargas testified that defendant used "a few" Spanish words during the interview, but the majority of his responses were in English. Vargas testified he never brought in a Spanish interpreter even though one was might have been available.

*F. The Court's Further Findings*

After defense counsel completed his cross-examination of Officer Vargas, the court excused the jury and made additional findings about why it decided to admit defendant's pretrial statements to Vargas.

The court explained the "turning point" for its ruling "was the extent of the continued statements by [defendant], in fact, more emphatically it was clear to me that

30

*there were parts of the interview where he didn't understand what the officer was saying, and it appeared to me based on just listening to it that it wasn't because he didn't understand English, it seemed to me that in my – I had trouble understanding sometimes was the officer[] talked too quickly.* And so – but whenever that happened, the defendant was quick to point out to the officer he didn't understand and the officer either explained it or went over it with him just like he did with the *Miranda* warning. *He went over it line by line very carefully, methodically, and, you know, it wasn't a slip shot interview at that point.* It might at first, and actually when I heard your argument it sounds like this is a real issue. [¶] But when you actually listen to it it was clear to me that he was fully able to understand it." (Italics added.)

As noted in the factual statement above, defendant testified on direct examination that he spoke English "between 10 and 15 percent." He understood "some things, there are other things I do not understand." He always spoke Spanish to Sonia's mother and his own children.

During a break in defendant's direct examination testimony, the court made additional comments about why it admitted defendant's pretrial statements:

> "[L]istening to the audio portion of the recording and listening to [defendant] testify today as far as the Court is concerned with respect to the recorded portion of that interview *it's like it's two different people.* [¶] I mean my interpretation of the statement and the things that happened during that interview was that that person understood, in my belief 90, 95 percent of what the officer asked him and when he didn't understand he told the officer he didn't understand, and the officer took the time to explain it to him. So, anyway, I just wanted to add that."**10** (Italics added)

---

**10** In closing argument, the prosecutor acknowledged that defendant claimed he did not understand English and felt it was not fair that Officer Vargas interviewed him in English. The prosecutor reminded the jury that when defendant testified, there were "multiple times" when he answered the attorneys' questions without waiting for the interpreter to translate. Defense counsel asserted that defendant might have been able to

*G. A Defendant's Language Abilities*

Defendant relies on the recording of his interview with Officer Vargas, and argues his *Miranda* waiver was not knowing and intelligent, and all his statements were involuntary, because Vargas never provided him with a translator even though defendant asked for one.

In considering the totality of the circumstances to determine if the defendant gave a valid *Miranda* waiver, and whether his statement was voluntary for due process purposes, the court takes into account the "background, experience, and conduct of the accused" (*People v. Davis* (2009) 46 Cal.4th 539, 586), including the defendant's language abilities. (*United States v. Bernard S.* (9th Cir. 1986) 795 F.2d 749, 751 (*Bernard S.*), disapproved on other grounds in *United States v. Dozier* (9th Cir. 1988) 844 F.2d 701, 706; *United States v. Heredia-Fernandez* (9th Cir. 1985) 756 F.2d 1412, 1415; *United States v. Martinez* (9th Cir. 1978) 588 F.2d 1227, 1235.)

A defendant's language abilities may impair his ability to give a knowing and intelligent waiver, and render his statement involuntary. (See, e.g., *United States v. Heredia-Fernandez*, *supra*, 756 F.2d 1412, 1415; *United States v. Hernandez* (10th Cir. 1990) 913 F.2d 1506, 1510.) "Language is not a stumbling block when the suspect is advised of his rights also in a language that he ostensibly understands. [Citation.] It becomes a more difficult problem when the *Miranda* rights are given in English only. In these instances, the courts consider what effort the officer made to communicate, whether the defendant responded that he understood his rights or ever indicated that he did not understand them, and what the defendant displayed in English language skills." (*United States v. Castorena-Jaime* (D. Kan. 2000) 117 F.Supp.2d 1161, 1171.)

---

speak a little English, but there was still a language barrier and an interpreter should have been provided since defendant's life was at stake.

Defendant relies on *United States v. Garibay* (9th Cir. 1998) 143 F.3d 534 (*Garibay*), in support of his argument that his *Miranda* waiver and subsequent statements were involuntary. In that case, the defendant was arrested after customs agents found marijuana in his car. The agents asked the defendant if he understood English. The defendant said yes. An agent read the *Miranda* warnings to the defendant in English. Defendant indicated he understood the warnings, and he gave incriminating statements. On appeal, defendant argued the trial court should have granted his motion to exclude his statements because he did not understand the nature of the rights he was waiving, and he did not understand the agent's recitation of the *Miranda* rights in English, based on his limited skills in English and his low mental capacity. (*Id*. at pp. 536–538.)

*Garibay* held the defendant's confession was obtained in violation of *Miranda* and his waiver was invalid. *Garibay* noted the interrogating agent never offered the defendant the option of conducting the interrogation in Spanish, and the defendant never refused such an offer. The agent simply assumed the defendant was sufficiently proficient in English to understand and waive his rights without the assistance of a Spanish interpreter. The agent admitted that he had to rephrase questions when the defendant did not seem to comprehend what he was saying. The defendant's primary language was Spanish, and he only understood a "few things" in English. He received D+ grades in high school English, and received passing grades in classes that were taught in Spanish. The witnesses at the suppression hearing included a clinical psychologist, the probation officer, and the defendant's former high school instructors, who testified they always spoke to the defendant in Spanish at his request. His high school football coach stated that the defendant often claimed to understand English, and gave the appearance of comprehending English, when he was under stress and interacting with persons of authority, but that he did not understand what was being said to him on those occasions. There was also undisputed evidence that the defendant was "borderline retarded" with

33

"extremely low verbal-English comprehension skills." (*Garibay*, *supra*, 143 F.3d at p. 538.)

*Garibay* concluded that under the totality of the circumstances, the defendant's waiver was not knowing and intelligent based on the absence of a written waiver, the failure to give the *Miranda* warnings in Spanish, the lack of a translator's help, the need for repeated explanations of his rights, and his lack of prior experience with the criminal justice system. (*Garibay*, *supra*, 143 F.3d at pp. 538–539.)

A similar result was reached in *United States v. Short* (6th Cir. 1986) 790 F.2d 464 (*Short*), where the defendant was arrested for aiding and abetting her husband's sexual abuse of their child. She gave an inculpatory statement after being advised of the *Miranda* warnings in English. *Short* held there was a "serious question" whether the defendant's waiver was knowing and intelligent. (*Id*. at p. 469.) The defendant was from West Germany and had lived in the United States for only three months. She could not drive, did not have any friends aside from her husband, and spoke only broken English. The defendant was not familiar with the American criminal justice system. A social services officer had been present during the interrogation, and testified that she questioned whether the defendant understood the implications of her answers, and thought the defendant appeared ignorant and showed judgment limitations. At her first court appearance, the court determined the defendant did not understand what was going on, and appointed a German-language interpreter to assist her. (*Id*. at p. 469.)

> "The government agents concede that [the defendant's] English was so poor that they took special precautions in explaining the *Miranda* warnings to her. In fact, that is the basic argument used to support their characterization of the confession as a voluntary one. This position is undermined, however, by the Magistrate's view that [the defendant] would not be able to understand the proceedings against her without *translation into German.* We have only the agents' opinion that [the defendant] understood what was happening. The language of the written statement is

34

obviously not [the defendant's]. It is, at best, the agents' interpretation of her halting English…." (*Id.* at p 469, italics in original, fn. omitted.)

### 1. Valid Waivers and Voluntary Statements

Even where a defendant has limited skills in English, however, he may knowingly, intelligently, and voluntarily waive his *Miranda* rights, provided the totality of the circumstances indicates that he understood those rights when he waived them. (*People v. Salcido* (2008) 44 Cal.4th 93, 127–128 (*Salcido*); *United States v. Amano* (9th Cir. 2000) 229 F.3d 801, 804–805 (*Amano*).) A series of cases illustrate valid waivers in these circumstances.

In *Salcido*, *supra*, 44 Cal.4th 93, the defendant was arrested in Mexico, and the police escorted him to California to face multiple murder charges. During the flight to California, the investigating detective advised the defendant of the *Miranda* warnings in English. The defendant waived his rights and gave an incriminating statement. On appeal, the defendant relied on *Garibay*, and argued his *Miranda* waiver was invalid and his statement was involuntary because "his asserted inability to communicate effectively in English contributed to a 'perception that the lawyer [provided for him by the government] would be in the Sheriff's employ and not necessarily aligned with defendant's best interests,' and evidently the impression that there would be no benefit in requesting or receiving the assistance of an attorney." (*Id.* at p. 128.)

*Salcido* rejected the defendant's claim that his statements were involuntary or his situation was similar to that addressed in *Garibay*:

> "In the present case, … the transcript of advisements, followup questions, and defendant's responses establishes that Detective Edmonds inquired whether defendant wished to receive the advisements in English or in Spanish and whether he was more comfortable conversing in English or in Spanish. Spanish-speaking agents were present on the flight, with whom defendant could consult if there was something he did not understand. In addition, as explained in expert testimony, defendant had an above-average IQ. Unlike the defendant in *Garibay,* defendant was provided an ample opportunity to be advised in Spanish and to communicate in that language,

35

and had the innate intelligence to decide whether to avail himself of that opportunity." (*Salcido*, *supra*, 44 Cal.4th at pp. 128–129.)

In *Bernard S., supra,* 795 F.2d 749, a minor was taken into custody for an assault. His native language was Apache. He was questioned by an FBI agent. The minor's mother and a police officer were present during the interview, and they both spoke Apache. The agent advised the minor of the *Miranda* warnings in English by reading from a standard form. The agent then explained each individual right to the minor and his mother. After reading each right, the agent asked the minor if he understood his rights, and he said yes. The minor signed a written waiver in English. The minor never said he did not understand his rights. During the interview, the minor responded to the agent's questions in English. The minor asked his mother and the police officer "to explain a few items into Apache, but these translations were made after the *Miranda* rights were read and waived, and did not involve those rights" but were brief clarifications, and " 'virtually the entire conversation was done in English ….' " (*Id*. at p. 751 & fn. 1.)

*Bernard S.* rejected the minor's claim that his *Miranda* waiver was invalid because he had a limited knowledge of English, and the *Miranda* warnings were not explained to him in Apache. (*Bernard S.*, *supra*, 795 F.2d at p. 752.)

> "It is clear from the record that [the minor] does have some difficulty with English. He testified that he neither reads nor writes English, he occasionally spoke Apache with his mother and [the police officer] during the questioning to clarify some items, and he was assisted in his testimony at trial by an interpreter. On the other hand, he admitted that he studied English through the seventh grade and that he answered [the agent's] questions in English. [¶] Most importantly, after [the agent] explained each of his rights to him in English, [the minor] stated that he understood his rights. [The agent] testified that 'I asked him if he understood [his rights], if he understood all of the wording, and he stated that he did. He didn't have any questions. I also made sure that his mother understood what his rights were. And I explained to both of them and asked them if they understood. And they stated that they did.' At no time did appellant indicate that he did not understand his rights. [¶] Despite the

36

language difficulties encountered by [the minor], the evidence seems to indicate that he understood his rights and voluntarily, knowingly, and intelligently waived them. [Citations.]" (*Id*. at p. 752, fns. omitted.)[11]

In *Campaneria v. Reid* (2nd Cir. 1989) 891 F.2d 1014 (*Campaneria*), the defendant was interviewed in a hospital's intensive care unit after having surgery for stab wounds. The officer questioned the defendant about whether he had murdered the man who stabbed him. The court rejected the defendant's argument that his *Miranda* waiver was invalid because of his "poor grasp of English," or that his statements were involuntary and coerced because of the circumstances of the hospital interview. (*Id*. at p. 1020.)

> "Even though his proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights. [The defendant's] native tongue is Spanish. *Nonetheless, the record, and in particular the transcript of the recorded interview, reveals that, although he spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the Miranda warnings given to him.* According to his medical records, he was alert and observant during the times that the warnings were given. On each occasion that he was advised of his rights, he indicated that he understood those rights." (*Ibid*., italics added, fn. omitted.)

In *United States v. Abou–Saada,* (1st. Cir. 1986) 785 F.2d 1 (*Abou-Saada*), the defendant was charged as part of an international narcotics conspiracy. He argued his statements to government agents should have been suppressed because his English was too poor, and his education, background, and intelligence were too limited for him to understand the *Miranda* warnings, particularly since the government later provided him with a translator. (*Id*. at p. 10.) The court rejected the defendant's argument that the very fact he was provided an interpreter showed an inadequate knowledge of the English

---

[11] In reaching this holding, *Bernard S.* further held that a written *Miranda* waiver was strong but not dispositive evidence of voluntariness, and only one factor to be considered in determining whether there had been a valid waiver. (*Bernard S.*, *supra*, 795 F.2d at p. 753, fn. 4.)

language. The court instead looked to a number of circumstances showing the defendant's ability to understand and use the English language:

> "[The defendant] is undeniably a foreigner. And, he testified to a limited educational background having permanently left school at age 16. On the other hand, [defendant] has lived in the United States for 16 years. The DEA agents who initially questioned him said he could answer their questions perfectly well in English, to the point of describing the medical details of a complicated neck injury he had suffered. And, his interpreter said he would sometimes answer questions in English before they were translated. Additionally, the suppression hearing transcript offers considerable support for the district court's conclusion that [defendant] was evasive and inconsistent. His claims, for example, that he understood nothing at all, not even the Arabic translations of the *Miranda* warnings (because of the interpreter's 'Egyptian accent') might reasonably be taken as showing the opposite…." (*Id*. at pp. 10–11.)

In *Amano*, *supra*, 229 F.3d 801, the defendant, a Japanese national, was arrested in Arizona as part of a counterfeiting investigation. An officer advised the defendant of the *Miranda* warnings in English. The defendant spoke in English with a Japanese accent, and said he understood his rights. The defendant answered the officer's questions, and said he was from Japan. The defendant was subsequently interviewed by another officer, who again advised him of the *Miranda* warnings in English. The officer also presented the defendant with a printed waiver form in English. The defendant signed the waiver form, answered additional questions in English, and also signed an English-language form which authorized a search of his apartment. (*Id*. at pp. 802–803.) On appeal, the defendant argued his waivers were involuntary because he was advised of the *Miranda* warnings in English, his native language was Japanese, he had limited English skills, he did not have the assistance of an interpreter, and he was not informed of his right to contact the Japanese consulate. (*Id*. at p. 805.)

*Amano* held the defendant's waivers were voluntary because he had "sufficient skills in English to understand his rights, to waive them, and to make a statement against

38

his interest." (*Amano*, *supra*, 229 F.3d at p. 805.)  The court cited the testimony of the interviewing officers, that defendant appeared "to understand and converse comfortably in English," and on the discovery of "a variety of English-language materials in Defendant's home." (*Ibid*.)  "Defendant's understanding of English obviated the need for an advice of rights in Japanese or for an interpreter," and his previous lack of contact with the criminal justice system, and his lack of contact with the Japanese consulate, did not render his waiver involuntary.  (*Ibid*.)

In *Cruz*, *supra*, 44 Cal.4th 636, the defendant was advised of the *Miranda* warnings through a Spanish interpreter.  When asked if he understood his rights, defendant replied in Spanish, " 'mas o menos,' which means 'more or less.' " (*Id*. at p. 666.)  The defendant cited this response and argued his subsequent waiver was not knowing and intelligent, because he did not understand his rights even though the *Miranda* warnings had been translated.  *Cruz* rejected the argument because after the defendant made this statement, the officer again advised the defendant of the *Miranda* warnings through the interpreter, separately explained each line in "less 'formal' terms," and the defendant acknowledged he understood and waived his rights.  (*Id*. at pp. 667–668.)

*H. Analysis*

After listening to the entire audio-recording of Officer Vargas's interview with defendant, we find that defendant's *Miranda* waiver was knowing and intelligent, and his statements were not involuntary or obtained in violation of due process.  When Vargas initially advised defendant of the entirety of the *Miranda* warnings in English, and asked if he understood, defendant responded in Spanish.  Vargas testified, without contradiction, that defendant's response meant "more or less."  Defendant said his first language was Spanish and he did not want to answer in English.  Vargas asked how long he had spoken English, and defendant confirmed he knew "most of basic English."

39

Vargas said he would continue in English, to let him know if he did not understand anything and, if so, "I can get somebody that speaks Spanish to explain it in Spanish if you need it." Defendant again said he felt more comfortable in Spanish. Vargas asked him to give it a try and if he needed a Spanish interpreter, he would call the Spanish officer on duty to help out, and defendant agreed.

With that, Officer Vargas again advised defendant of the *Miranda* warnings, but this time he read and explained each right individually – the right to remain silent meant he had the right not to talk to Vargas; and anything they talked about would be used in court later on. Vargas explained he had the right to a lawyer, asked defendant if he knew what a lawyer was, and defendant said that was a "defender." Vargas explained that if he did not have any money for a lawyer, one would be given to him and he did not have to worry about paying any bills. Vargas asked defendant if he understood his rights, defendant said he understood, and the interview began.

This interview sequence is somewhat similar to the situation in *Cruz*, where the defendant was advised of the *Miranda* warnings in Spanish, and said he understood " 'more or less.' " The question in *Cruz* was not whether a translator should have been used, but whether that defendant understood the legal impact of the *Miranda* warnings. *Cruz* held the defendant's waiver was knowing and intelligent because the officer explained each right, line by line, and the defendant said he understood each advisement. (*Cruz*, *supra*, 44 Cal.4th at pp. 667–668.) In this case, Officer Vargas spoke to defendant in English but also advised him of each individual right and gave examples, in order to make sure that defendant understood his rights. After each explanation, defendant said he understood.

Defendant argues that his waiver was not knowing and intelligent since Officer Vargas spoke to him in English and failed to provide a Spanish translator. As demonstrated by the cases above, however, a defendant with limited skills in English may

40

still have the ability to knowingly, intelligently, and voluntarily waive his *Miranda* rights, provided the totality of the circumstances indicates that he understood those rights when he waived them. (*Salcido*, *supra*, 44 Cal.4th at pp. 127–128; *Amano*, *supra*, 229 F.3d at pp. 804–805.)

In contrast to the situations addressed in *Garibay* and *Short*, the recording refutes any assertion that Officer Vargas simply assumed defendant was sufficiently proficient to understand the English-language rendition of his constitutional rights. Vargas advised defendant that he would call in an officer to act as a Spanish-language translator if he felt he still needed one, and never said that calling in a translator would be difficult or take too much time. Also in contrast to *Short*, defendant had not just arrived in the country and lived in an isolated situation. He had lived in the United States for many years, he had worked in businesses which required interaction with the general public, and he had family and friends in the community.

As in *Bernard S.* and *Salcido*, Officer Vargas carefully explained and gave examples to illustrate the meaning of each constitutional right, defendant said he understood his rights, and he never again asked for a translator. The rest of the one-hour interview was conducted almost entirely in English. As in *Campaneria* and *Abou-Saada*, the recording of the entire interview showed that defendant did not simply give responses that were expected of him. Defendant had a good command of the English language and his answers were responsive to Vargas's questions. Indeed, defendant's lengthy narrative answers showed his understanding of English, and his realization of the seriousness of the allegations. He repeatedly denied that he touched Sonia's vagina or private area. Defendant showed he understood the meaning and importance of DNA evidence. Upon being confronted with possible tests of Sonia's clothing, defendant conceded it was possible his DNA might be on her underwear and he might have touched her vagina, but claimed he did not pay attention while he gave her the massage, and then reverted back to

41

his insistence that he did not touch her private area. These exchanges again showed his command of the English language, and that he understood the seriousness and significance of these questions and answers.

Defendant's own statements to Officer Vargas undermine his claim that he did not understand the *Miranda* advisement, his waiver of rights, or the significance of Vargas's questions and his answers. Toward the end of the interview, Vargas asked defendant if he had explained himself well. Defendant said yes and that he had understood Vargas, but he didn't know the "real situation." Vargas said the "real situation" was that defendant had inappropriately touched a minor female. Defendant replied, "I understand that."

Defendant asserts his waiver was not knowing and intelligent because he did not sign a written waiver, and there is no evidence that he had prior experience with the criminal justice system. While defendant did not sign a written waiver, *Bernard S.* explained that such a fact was strong but not dispositive evidence of voluntariness, and the totality of the circumstances must be considered. Similarly, *Amano* held that a defendant's previous lack of contact with the justice system did not render a *Miranda* waiver involuntary if there was other evidence to show the defendant had sufficient skills to understand and waive his rights, and make a statement. (*Amano*, *supra*, 229 F.3d at p. 805.)

Defendant claims his statements should have been excluded because he never gave an express waiver. As we have explained, however, a valid waiver may be express or implied. Having acknowledged his understanding of his rights, defendant's clear willingness to answer Officer Vargas's questions constitutes such an implied waiver. (*Cruz*, *supra*, 44 Cal.4th at pp. 667–668.)

We thus conclude that the court properly denied defendant's motion to exclude his pretrial statements to Officer Vargas. The totality of the circumstances show that

42

defendant knowingly and intelligently waived his Fifth Amendment rights, and his statements were voluntary and not obtained in violation of due process.

## II. Substantial Evidence for Count I

Defendant contends his conviction in count I, sexual penetration of a minor over the age of 14 years old by means of force in violation of section 289, must be reversed because there is insufficient evidence to establish the element of penetration, particularly that his hand or finger penetrated Sonia's vagina. Defendant points to Sonia's conflicting answers at trial, and her prior statements to Officer Vargas, in support of his argument that there was insufficient evidence of penetration. As we will explain, however, section 289 is violated by "the penetration, however slight, of the genital … opening" of the victim (§ 289, subd. (k)(1)), and the jury's verdict is supported by substantial evidence.

### A. *Substantial evidence*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. [Citation.]" (*People v. Bean* (1988) 46 Cal.3d 919, 932–933; *People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary

43

conflicts; we look for substantial evidence. [Citation.]" (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.)

B. *Sexual Penetration*

Defendant was convicted in count I of violating section 289, subdivision (a)(1)(C), which states:

> "Any person who commits an act of sexual penetration upon a minor who is 14 years of age or older, when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, shall be punished by imprisonment in the state prison for 6, 8, or 10 years."

Section 289, subdivision (k)(1) further defines the offense and states:

> "Sexual penetration' is the act of causing the penetration, *however slight*, *of the genital or anal opening of any person* or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse *by any foreign object*, substance, instrument, or device, or by any unknown object." (Italics added.)

A finger is a foreign object within the meaning of section 289. (*People v. Keeney* (1994) 24 Cal.App.4th 886, 889.)

The "penetration" required to violate section 289 is statutorily defined as "genital" penetration, not "vaginal" penetration. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1367 (*Quintana*); *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1098; *People v. Karsai* (1982) 131 Cal.App.3d 224, 232, overruled on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.) "A 'genital' opening is not synonymous with a 'vaginal' opening ...." (*Quintana*, *supra*, at p. 1367.) "The vagina is only one part of the female genitalia .... Thus, 'genital' opening does not necessarily mean 'vaginal' opening." (*Ibid*.) Accordingly, any contact within the external genitalia is sufficient, and vaginal penetration is not necessary. (*Id*. at pp. 1366, 1371; *People v. Karsai*, *supra*, 131

44

Cal.App.3d at p. 232.) Sexual penetration may be proved by circumstantial evidence. (*People v. Stevenson* (1969) 275 Cal.App.2d 645, 650.)

The jury in this case was correctly instructed that sexual penetration for count I meant "penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal, or gratification"; penetration for sexual abuse meant "penetration for the purpose of causing pain, injury, or discomfort"; and an "unknown object included any part of the body."

### C. Analysis

Defendant asserts there is insufficient evidence of penetration of the victim's vagina, given her inconsistent statements about how and where he touched her body. However, a violation of section 289 does not require penetration of the victim's vagina, but of the victim's genital area. As set forth in the factual statement above, Sonia testified defendant used his hand and touched her in the same area of her genitalia. The prosecutor showed Sonia the diagram of the female body, Sonia circled an area and said it was the vagina, and she testified that defendant touched her vagina with his hand.

On redirect examination, the prosecutor asked Sonia if defendant touched her in the vagina, and Sonia said yes.

> "Q. Now to clarify, did the defendant touch you *in the vagina?*
>
> "A. *Yes.*" (Italics added.)

As explained above, any contact within the external genitalia is sufficient, and vaginal penetration is not necessary. (*Quintana*, *supra*, 89 Cal.App.4th at pp. 1366, 1371.) Sonia's testimony that defendant touched her "in the vagina" constitutes substantial evidence of contact within the external genitalia, and that he penetrated her "genital area" as required by section 289.

Defendant asserts there is insufficient evidence of penetration based on Sonia's conflicting trial testimony and her responses on cross-examination, particularly as to what

she told Officer Vargas during her pretrial interview. Defense counsel repeatedly attempted to impeach Sonia with her prior statements to Vargas about where defendant touched her. Sonia admitted that Vargas asked her if defendant touched her vagina and she said no. Sonia also testified she did not remember what she told Vargas, she did not remember whether defendant put his finger inside her "private part," but she did not lie to Vargas. On redirect examination, however, Sonia testified defendant touched her "in the vagina," as set forth above. Immediately after this testimony, defense counsel used recross-examination to ask Sonia to explain that answer.

> "Q. Sonia, the prosecutor just asked you if [defendant] touched you in the vagina and a little while ago you said you didn't remember and I showed you documents and you still didn't remember saying no and right now you just said yes he did. Is there something that happened right now between the time I asked you and the time the prosecutor asked you that triggered your memory?

> "A. I don't get your question because you like you talk really fast.

> "Q. I'm sorry?

> "A. I don't get your question.

> "Q. You didn't understand my question?

> "A. No.

> "Q. And so when [the prosecutor] said 'touch you in the vagina' you said yes without hesitation?

> "A. Yeah.

> "Q. Did you just say that because [the prosecutor] asked it that way or because [defendant] actually … [¶] touched you inside your vagina?

> "A. *He did touch me.*

> "Q. Oh, he did?

> "A. Yeah, but you were asking me another question.

46

"Q.    Okay.  But when the officer asked you you said he didn't, do you remember that?

"A.    No."  (Italics added.)

The jury was thus aware that Sonia gave inconsistent statements to Officer Vargas at trial, but Sonia explained these inconsistencies and ultimately testified defendant touched her "in the vagina."

Defendant's reliance on inconsistencies in Sonia's trial testimony cannot be the basis for finding that his conviction in count I is not supported by substantial evidence.  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.  [Citation.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The "inherently improbable" standard for rejecting testimony on appeal "means that the challenged evidence is 'unbelievable per se,' such that 'the things testified to would not seem possible.'  [Citation.]  The determination of inherent improbability must be made without resort to inference or deduction, and thus cannot be established by comparing the challenged testimony to other evidence in the case."  (*People v. Ennis* (2010) 190 Cal.App.4th 721, 725.)

Defense counsel impeached Sonia's testimony with her prior statements to Officer Vargas, and there was nothing in these exchanges that rendered her testimony inherently improbable as to whether defendant penetrated her "genital area" with his hand, as required by section 289.  Defendant's challenge to the evidence in support of count I is based "entirely on comparisons, contradictions and inferences," and "amounts to nothing more than an attack on witness credibility, and cannot be the basis for a reversal of the judgment on appeal."  (*People v. Ennis*, *supra*, 190 Cal.App.4th at p. 725.)

47

**III.  Failure to Instruct on Attempt as a Lesser Included Offense for Count I**

Defendant next contends the court committed prejudicial error when it failed to instruct the jury that attempt was a lesser included offense of count I, sexual penetration of a minor by means of force.  Defendant argues Sonia's inconsistent statements supported an attempt instruction, and the court had a sua sponte duty to give the instruction despite defense counsel's statement that attempt was not a lesser included offense of count I.

*A.  Lesser Included Offenses*

"A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, ' "that is, evidence that a reasonable jury could find persuasive" ' [citation], which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*' [citation].  [Citations.]"  (*People v. Cole* (2004) 33 Cal.4th 1158, 1218, italics in original.)  The duty exists even when the lesser included offense is inconsistent with the defendant's own theory of the case and the defendant objects to the instruction.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155 (*Breverman*); *People v. Valdez* (2004) 32 Cal.4th 73, 115.)

"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could … conclude[]" ' that the lesser offense, but not the greater, was committed.  [Citations.]  [¶]  In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury.  [Citations.]"  (*Breverman*, *supra*, 19 Cal.4th at p. 162, italics in original.)

48

"Moreover, as we have noted, the sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*Breverman*, *supra*, 19 Cal.4th at pp. 162–163, fn. omitted.)

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.]" (*People v. Cole*, *supra*, 33 Cal.4th at p. 1218.)

"[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility. [S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. [Citations.]" (*Breverman*, *supra*, 19 Cal.4th at p. 165; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

*B. Instructional Conference*

The court initially addressed instructions during a break in defendant's testimony. The court noted the possible lesser included offenses for count I, sexual penetration of a minor by means of force, were attempt, simple assault, and battery. The court believed that for count II, sexual battery, the lesser offenses were attempt, battery, assault, and misdemeanor sexual battery. The court asked defense counsel if he wanted to request any lesser instructions. Counsel replied that he wanted to wait until defendant completed his testimony and he rested the case.

The court said that based on the evidence to that point, it did not appear that attempt would be a lesser included offense for either counts I or II. The court stated that

49

it also did not appear that simple assault or battery would be lesser offenses for count II, but that misdemeanor sexual battery would be included.

After the parties rested, the court returned to the instructions on lesser included offenses and asked defense counsel for his position. Defense counsel said that as to count I, sexual penetration, there was sufficient evidence to give lesser included instructions for simple assault and battery.Counsel continued:

> "[Defense counsel]: … The attempt, that I don't know still the same attempt, I don't see it maybe the Court sees it.

> "The Court: *The intent is not the same*.

> "[Defense counsel]: Right.

> "THE COURT: …. I don't see an attempt as to any of the offenses.

> "[Defense counsel]: *Right, and that's my position*.

> "THE COURT; And you know what, let's just see if maybe we can shorten it up a little bit. There's really no attempt to any of them as far as I'm concerned. A simple assault and simple battery as to Count 1 I have to make a determination as to whether or not there's enough evidence to show that the jury could find those as opposed to the first count and I believe that that's a potential possibility, so I would probably give the assault … and the battery… The lesser includeds as to Count 1 would be [CALCRIM Nos.] 915, 960…. As to the [section] 243.4(a), that's the felony, [section] 243.4(e) … is a lesser included and the assault and the battery…. [¶] So that's the Court's intention, do you want to argue with me…?"

> "[Defense counsel]: No. As to Count 1 I would agree. Count 2, just to clarify, is the simple assault and battery?

> "THE COURT: Correct…

> "[Defense counsel]: I have no objection." (Italics added.)

The prosecutor objected to giving assault and battery as lesser included offenses for counts I and II because assault was "really an attempted battery," and there was

50

sufficient evidence to find counts I and II had been committed. The court disagreed and said it would give assault and battery as lesser included offenses for both felony charges.

The court instructed the jury that as to count I, sexual penetration of a minor by force, and count II, felony sexual battery, the lesser included offenses were simple assault (CALCRIM No. 915) and simple battery (CALCRIM No. 960); and misdemeanor sexual battery (CALCRIM No. 938) was also a lesser included offense for count II.

*C. Attempted Sexual Penetration*

Defendant argues the court had a sua sponte duty to instruct on attempt as a lesser included offense of count I, sexual penetration of a minor by force.

"As a general matter, an attempt to commit a crime is a lesser included offense of the completed crime." (*People v. Ngo* (2014) 225 Cal.App.4th 126, 156 (*Ngo*).) "[W]here an attempt to commit an offense may be distinguished from the substantive offense solely by the failure to complete the actus reus, the elements of the attempted offense are all included in the greater offense." (*Ibid*.)

Under the law of attempt, in many instances "when the completed offense is a general intent crime, an attempt to commit that offense does not meet the definition of a lesser included offense under the elements test because the attempted offense includes a specific intent element not included in the complete offense. [Citations.]" (*Ngo*, *supra*, 225 Cal.App.4th at pp. 156–157, fn. omitted.)

As relevant to this case, sexual penetration of a minor in violation of section 289, as further defined by section 289, subdivision (k), is a specific intent crime. (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538–1538 (*McCoy*); *Ngo*, *supra*, 225 Cal.App.4th at p. 157.)[12] "[T]he crime of unlawful sexual penetration requires the specific intent to

---

[12] The court correctly instructed the jury in this case that the charged offense of sexual penetration of a minor by force was a specific intent crime. (*McCoy*, *supra*, 215 Cal.App.4th at p. 1541; CALCRIM No. 1045.)

gain sexual arousal or gratification or to inflict abuse on the victim. However, as long as the act of penetration is done with this specific intent, and that act is 'accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person'[citation], the crime has been committed. This is so regardless of whether the force, violence, duress, menace, or fear is also used with the intent to gain sexual arousal or gratification or to inflict abuse on the victim." (*McCoy*, *supra*, 215 Cal.App.4th at p. 1538.)

Thus, both attempt and the completed offense of sexual penetration of a minor by force are specific intent crimes, and attempt is a lesser included offense of sexual penetration of a minor as charged in count I. (*Ngo*, *supra*, 225 Cal.App.4th at pp. 157–158.)

### D. Ngo

In *Ngo*, *supra*, 225 Cal.App.4th 126, the court addressed whether attempt instructions should have been given when the charged offense was sexual penetration of a child aged 10 years old or younger. The defendant argued the court had a sua sponte duty to instruct on attempt as a lesser included offense, and committed prejudicial error in failing to do so. The People agreed attempt was a lesser included offense of the completed crime, but argued the court did not have a sua sponte duty to give the instruction because the crime of attempt was not supported by substantial evidence. (*Id.* at pp. 130, 148, 155.)

*Ngo* held that attempt was a lesser included offense of sexual penetration of a minor. (*Ngo*, *supra*, 225 Cal.App.4th at pp. 157–158.) *Ngo* also held there was substantial evidence to support the instruction based on the trial testimony in the case:

> "In her initial statements to police, [the seven-year-old victim] was consistent in stating that defendant touched her …, *but she was equivocal as to whether defendant actually penetrated her*. In Mother's statements to police and in her trial testimony, she stated that she interrupted defendant's

52

touching of [the victim] when she walked into the living room.  Mother testified that she saw defendant's hand in [the victim's] pants, but she did not see whether defendant penetrated [the victim].  Mother told police she did not believe defendant had penetrated [the victim].  Defendant admitted touching [the victim], as corroborated by the scratch on her stomach, but he consistently denied that he penetrated her.  *This evidence is consistent with the possibility that defendant attempted to penetrate [the victim], but that Mother interrupted the attempt when she walked into the room.*  We find this constitutes ' " 'evidence that a reasonable jury could find persuasive' " ' as to attempted sexual penetration.  [Citation.]  Therefore, the trial court had a sua sponte duty to instruct the jury accordingly, and it erred in failing to do so." (*Id*. at p. 157, italics added, fn. omitted.)

*Ngo* further held the failure to instruct on attempt as a lesser included offense was prejudicial because of weak trial evidence of penetration, the lack of any physical evidence, the mother's testimony that she did not believe the child had been penetrated, and the victim's "contradictory" statements "as to whether the defendant penetrated her." (*Ngo*, *supra*, 225 Cal.App.4th at p. 159)  In her initial interview with the police, the victim said the defendant touched various places on her body, and initially failed to say that he penetrated her vaginal area.  When an officer demonstrated the area that could have been touched, the victim said it happened and the defendant penetrated her, but the record failed to show whether the victim was talking about the charged offense or another incident that happened the prior year.  The interviewing officers failed to obtain a clear statement from the victim as to whether the defendant penetrated her vaginal area.  (*Id*. at pp. 159–160.)

*Ngo* concluded it was "reasonably probable the jury, had it been instructed on attempt, would have convicted defendant of attempted sexual penetration in lieu of the completed offense," and reversed his conviction.  (*Ngo*, *supra*, 225 Cal.App.4th at p. 161.)[13]

---

**13** *Ngo* noted that on remand, the prosecutor had the option "of accepting a conviction for the attempt offense," but that possibility was affected by the trial court's erroneous instruction that sexual penetration on a minor was a general intent crime.

*E. Analysis*

It is undisputed that the court has a sua sponte duty to instruct on a lesser included offense if supported by substantial evidence, even if the lesser offense is inconsistent with defendant's theory of the case and defendant objects to the instruction. It is also undisputed that attempt is a lesser included offense of count I, sexual penetration of a minor in violation of section 289. Thus, defendant has not forfeited review of this issue even though he agreed with the court's determination that attempt was not a lesser included offense of count I, and he did not request an attempt instruction.

In contrast to *Ngo*, however, there was no substantial evidence from which a reasonable jury could have found that defendant attempted to penetrate Sonia's genital area but he was prevented from completing the offense. Sonia's testimony constitutes substantial evidence of contact within the external genitalia, and that he penetrated her "genital area" as required by section 289. (*Quintana*, *supra*, 89 Cal.App.4th at pp. 1366, 1371.) Sonia testified she tried to flick his hand away and told him to stop, but defendant did not move his hand away from her body and did not stop. There is no evidence that defendant was interrupted or prevented from penetrating her genital area. Sonia testified he kept touching her until he finally stopped and left her bedroom.

In contrast, defendant testified at trial that he only gave Sonia a massage, and he never touched Sonia in a sexual way and never touched her vaginal area. Officer Vargas testified that during the pretrial interview, defendant said it was possible that he touched her vagina while touching her upper thigh. Vargas asked defendant if he touched Sonia between her legs. Defendant said yes. Vargas asked defendant if was possible that his DNA was on her panties. Defendant said it was a possibility.

---

(*Ngo*, *supra*, 225 Cal.App.4th at p. 161, fn. 21.) That situation is not present in this case because the jury herein was properly instructed that the violation of section 289, as charged in count I, was a specific intent crime.

54

Defendant asserts that as in *Ngo*, Sonia's inconsistent statements about whether defendant touched her vagina would have supported an attempt instruction. In *Ngo*, the victim gave equivocal statements to the police about whether the defendant penetrated her. However, the victim in *Ngo* never clarified whether she was referring to the charged incident or an act that happened a year earlier. More importantly, *Ngo* found the evidence showed the child's mother entered the room and likely interrupted the defendant as he attempted to penetrate the victim. *Ngo* concluded that such evidence would have supported an attempt instruction. (*Ngo*, *supra*, 225 Cal.App.4th at p. 157.)

In this case, however, the jury was presented with two opposing versions of events – the prosecution's version, based Sonia's testimony that defendant touched her vagina and penetrated her genital area, and defendant's version, that he gave Sonia a massage, and it was possible he touched her vaginal area. Even though Sonia gave inconsistent statements, there was still no evidence for the jury to have reasonably concluded that defendant attempted, but failed to complete, penetration of her genital area with the requisite sexual intent. If the jury had reached that conclusion, it could have found defendant guilty of one of the lesser included offenses which were given, felony assault and battery, and misdemeanor sexual battery.

## IV. Motion for New Trial; Ineffective Assistance

Defendant argues the court should have granted his motion for new trial based on trial counsel's alleged ineffective assistance, because counsel failed to cross-examine Sonia about her pretrial statement to Officer Vargas, that she said defendant never put his finger inside her vagina. Defendant argues trial counsel's failure to introduce this impeachment evidence was prejudicial error, and his new trial motion should have been granted.

We will review the procedural history of defendant's new trial motion and address the merits of defendant's underlying claim of ineffective assistance.

55

A. *Defendant's New Trial Motion*

Defendant was represented by retained counsel, Albert Garcia, during trial. As we have explained in the factual statement above, Officer Vargas conducted a recorded interview with Sonia. At trial, neither the prosecutor nor defense counsel sought to introduce the recording or transcript of the Vargas/Sonia interview before the jury. As we have also set forth above, Mr. Garcia used the transcript of the interview to cross-examine Sonia during trial.

After defendant was convicted, he discharged Mr. Garcia and retained attorney Jim Elia. Thereafter, Mr. Elia filed a motion for new trial, which raised numerous issues, including several allegations that trial counsel was prejudicially ineffective.[14]

As relevant to this appeal, defendant argued Mr. Garcia was ineffective because he failed to impeach Sonia with her pretrial statement to Officer Vargas about whether defendant penetrated her vagina, and he failed to cross-examine Vargas about whether Sonia said defendant did not penetrate her vagina.

In support of this argument, defendant's new trial motion quoted the following three excerpts from the transcript of the Vargas/Sonia interview, and argued these sections showed Sonia said defendant did not penetrate her vagina and Mr. Garcia should have introduced these into evidence.

> "Vargas: Did his fingers ever go inside of the private part?

---

[14] Defendant's new trial motion also asserted that his pretrial statement to Officer Vargas should have been excluded; there was insufficient evidence of penetration to support count I; and trial counsel was ineffective because he was not prepared to argue the *Miranda* motion, he should have objected to the transcript of defendant's interview with Vargas as incomplete, and he failed to call witnesses to testify about defendant's limited ability to speak English. The court denied the entirety of the motion. On appeal, defendant only challenges the court's denial of the motion as to counsel's failure to impeach Sonia with her prior statements to Vargas.

56

"[Sonia]:          [M]m.nnn.

"Vargas:          It never did?  Did it ever, did it touch any of this area right here?

"[Sonia]:          Um, I don't know how, just like, he was just like, going like that and…

"Vargas:          'Kay.  Okay, so, he was just goin' like this, right?

"[Sonia]:          Mm.hmm.

"Vargas:          [D]id he ever turn his finger?  Did he ever use his fingers for anything else (inaudible) so, he was just rubbing the <u>outside</u> of your vagina, or private part?  Is that what it's called?

"[Sonia]:          Yeah.  (<u>CD Transcript P.45</u>)

"Vargas:          Kay, you know in this area right here there's um, its an opening.  Did you know that?  This right here is an opening?

"[Sonia]:          Oh, yeah…

"Vargas:          Kay, you know in this area right here there's um, its an opening.  Did you know that?  This right here is an opening?

"[Sonia]:          Oh, yeah…

"Vargas:          Kay, at any point did his hands ever go inside the opening?

"[Sonia]:          Yeah…

"Vargas:          It did…

"[Sonia]:          But, yeah but…

"Vargas:          [A]nd when I mean opening do you know, you know what the part I'm talkin about?

"[Sonia]:          [Y]eah, that.  Like, right here.

"Vargas:          [Y]ea did he ever, did his hands or fingers ever go inside here?  It never did?

"[Sonia]:     No…  (<u>CD T Victim P 75</u>)

"Vargas:     It was always on the outside?

"[Sonia]:     [Y]eah.  (<u>CDT Victim P 76</u>)"  (Underline in original.)

Defendant's motion stated that after this exchange, Officer Vargas continued this line of questioning and Sonia "change[d] her story in an apparent attempt to tell the officer what may have been the truth or what she believed at this point the officer wanted to hear."

Defendant's motion thus concluded that trial counsel was prejudicially ineffective for failing to introduce the above-quoted excerpts from the Vargas/Sonia interview because they "clearly show[] the evidence of penetration and force was lacking when judged by a reasonable doubt standard." The motion states the "CD record" of the Vargas/Sonia interview was "never read or introduced to the jury."

### B. The People's Opposition

The People filed opposition to defendant's new trial motion, and argued that trial counsel was not ineffective because he extensively impeached Sonia's testimony with her prior statements to Officer Vargas. The People stated that counsel had the entirety of Sonia's recorded interview with Vargas, and counsel's tactical decisions on how to conduct cross-examination were not ineffective.

### C. Hearing on the New Trial Motion

On April 10, 2014, the court heard argument on defendant's new trial motion. The court stated it had reviewed the entirety of the file, along with the motion and opposition.[15] Mr. Elia argued trial counsel was ineffective because he should have

---

[15] At the hearing on defendant's motion for new trial, Mr. Elia advised the trial court that he attempted to file a copy of the transcript of Officer Vargas's interview with Sonia as part of his new trial motion, but the superior court clerk's office refused to accept it for filing because he failed to present four conformed copies. Mr. Elia stated that he instead personally delivered that transcript to the trial court's clerk.

impeached Sonia with her prior inconsistent statements to Officer Vargas, that defendant did not penetrate her vagina. Mr. Elia argued trial counsel should have introduced the entirety of the Vargas/Sonia transcript into evidence, there was no tactical reason for failing to impeach Sonia with her prior statements, and defense counsel failed to challenge her testimony about penetration.

The prosecutor replied that trial counsel vigorously cross-examined Sonia about all aspects of the incident and impeached her with her prior statements to Officer Vargas.

### D. The Court's Denial of the New Trial Motion

The court denied defendant's motion for new trial and said it was "not in agreement with the defense counsel's position with respect to its interpretation of the evidence that was presented and/or the facts as they occurred at the trial, but nonetheless the Court's position is to deny each and every request made with respect" to the motion.

### E. New Trial/Ineffective Assistance

To prevail on a claim of ineffective assistance on a motion for new trial, the defendant "must show both that his counsel's performance was deficient when measured

---

At oral argument, we advised the parties that the transcript of the interview between Officer Vargas and Sonia is not part of the appellate record. However, the complete audio recording of Vargas's interview with Sonia is before this court. It is on a CD that also contains the recording of Vargas's interview with defendant. The front of that CD is clearly marked and states that it contains both interviews. The CD was never introduced before the jury. At the beginning of defendant's trial, however, the parties stipulated that the superior court could lodge that CD into the trial record for purposes of review, and it was so lodged. This court augmented the appellate record to include that CD, and it is properly before this court.

Also at oral argument, the parties stipulated that this court may listen to the recording of Officer Vargas's interview with Sonia that is contained on the CD that was before the superior court, lodged in the trial record, and is part of the appellate record – in order to address defendant's appellate contentions as to whether his new trial motion should have been granted based on defense counsel's alleged ineffectiveness for failing to use her statements on that recording to impeach her trial testimony. As we will explain, this court has listened to the entire recording.

59

against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659–660.)

"In general, reviewing courts defer to trial counsel's tactical decisions in assessing a claim of ineffective assistance, and the burden rests on the defendant to show that counsel's conduct falls outside the wide range of competent representation. [Citations.] In order to prevail on such a claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349.) "As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.]" (*People v. Cox* (1991) 53 Cal.3d 618, 662, fn. omitted, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.)

Defendant asserts counsel was ineffective because he failed to cross-examine and impeach Sonia with her prior inconsistent statements to Officer Vargas, particularly Sonia's statement quoted from the Vargas/Sonia interview transcript that defendant did not penetrate her vagina.

Defendant's claim of ineffective assistance is refuted by the entirety of Sonia's trial testimony which shows just the contrary – counsel extensively cross-examined Sonia with her prior statements, including whether she told Vargas that defendant never penetrated her vagina. The following exchange occurred at trial during cross-examination:

"[Defense counsel] … And do you remember if [Vargas] asked you if [defendant] put his finger inside?

"A.   Yeah.

"Q.   We'll call it 'vagina,' the word they use here; do you remember that?

"A.   Yeah.

"Q.   *And do you remember saying no*.

"A.   *Yes*."  (Italics added.)

This passage thus refutes defendant's ineffective assistance claim in his new trial motion, and shows that defense counsel impeached Sonia's trial testimony with her prior inconsistent statement to Officer Vargas – that defendant never penetrated her vagina.

Defense counsel next asked Sonia if Officer Vargas asked her if defendant put his hands "inside" her "opening," and whether Sonia said yes.  Sonia testified that she said yes to Vargas.

"Q.   And during that incident when you spoke to the officer, did you tell him that [defendant] put his finger inside your private part?

"A.   I don't remember.

"Q.   I'm sorry?

"A.   I don't remember.

"Q.   You don't remember?

"A.   Huh-uh.

"Q.   *Okay.  Did [defendant] put his finger inside your private part?*

"A.   *I don't remember*."  (Italics added.)

As we extensively discussed in issue II, *ante*, the prosecutor returned to this topic during his redirect examination.  Sonia testified she felt defendant's palm touch her

61

vagina, and circled that body part on the anatomically correct diagram.  The prosecutor asked Sonia about her inconsistent statements to Officer Vargas.  Sonia testified she told the truth to Vargas, but she was nervous and scared during the interview because the incident had "barely happened," and she did not tell Vargas everything that happened.

The prosecutor again asked Sonia how defendant touched her:

"Q.  Now to clarify, did the defendant touch you *in the vagina?*

"A.  *Yes.*"  (Italics added.)

Defense counsel tried to further impeach Sonia on recross-examination, and asked why she had changed her testimony.  Sonia replied:  "I don't get your question because you like you talk really fast."

"Q.  And so when [the prosecutor] said 'touch you in the vagina' you said yes without hesitation?

"A.  Yeah.

"Q.  Did you just say that because [the prosecutor] asked it that way or because [defendant] actually …  [¶]  touched you inside your vagina?

"A.  *He did touch me.*

"Q.  Oh, he did?

"A.  Yeah, but you were asking me another question.

"Q.  Okay.  But when the officer asked you you said he didn't, do you remember that?

"A.  No."  (Italics added.)

We conclude from these exchanges that defense counsel used Sonia's prior statements to Officer Vargas to try to impeach her trial testimony.  Despite this cross-examination, Sonia insisted defendant touched inside her vagina.

In his new trial motion, defendant argued that counsel was ineffective because "[t]he CD record was never read or introduced to the jury."  The record suggests defense

62

counsel made a tactical decision not to introduce any portion of the actual recording into evidence before the jury.

Our review of the audio recording confirms the accuracy of the three excerpts from the transcript as quoted in defendant's new trial motion – that Sonia said defendant's fingers were "always on the outside."

After quoting these sections, defendant's new trial motion further asserts that Officer Vargas continued this line of questioning and Sonia "change[d] her story in an apparent attempt to tell the officer what may have been the truth or what she believed at this point the officer wanted to hear." Defendant's motion did not quote any portion of the interview after this point.

The entirety of the recording refutes defendant's characterization that Sonia changed her story to say what Officer Vargas wanted to hear. Instead, Vargas used common terms to describe Sonia's genitalia and what was depicted on the anatomically-correct diagram. In response to these definitions, Sonia said defendant moved his hand back and forth, and moved the two "flaps" or "parts" which covered the opening to her genitalia, and that his fingers touched the inside of her "private part."[16]

The entirety of the record thus suggests defense counsel made the tactical decision not to introduce any part of the actual interview between Officer Vargas and Sonia because it supported the charged offense of sexual penetration.[17]

---

[16] There are several moments toward the end of the interview where Sonia apparently demonstrated to Officer Vargas how she was touched. The preliminary hearing transcript was not introduced at trial but, for purposes of defendant's ineffective assistance argument, it offers an explanation of Sonia's gestures. At the preliminary hearing, Vargas testified he asked Sonia if any of defendant's fingers entered her vagina. "When I asked her how – to describe how he massaged her vagina and entered into it, she put her palm down, fingers extended on the table in front of us, and she began to make circular motions while rubbing the table."

[17] In another portion of the interview, Officer Vargas asked Sonia if defendant had previously touched her. Sonia said no. Vargas asked, "Has he ever done this to anybody

63

Based on the record before this court, we find defendant's new trial motion was properly denied and trial counsel was not prejudicially ineffective in his cross-examination of Sonia.

## V.    <u>Section 654</u>

Defendant's final issue is that the court should have stayed the terms imposed for counts II and III pursuant to section 654, instead of imposing concurrent sentences, because he had a single intent and objective to touch Sonia during a single incident, which resulted in all three convictions.

### A. Background

At the sentencing hearing, the court advised the parties that it intended to impose the midterm of eight years for count I, and concurrent terms for counts II and III. The court said the probation report did not address whether the term for count II should be stayed pursuant to section 654. The court further noted that section 243.4, subdivision (g)(2) stated that "sexual battery" did not include the crimes defined in sections 261 (rape) and 289 (sexual penetration of a minor by force). The court believed that based on the statutory definition, "this offense, Count 2 offense and Count 1 offense would in essence not be [subject to section] 654 to one another. However, irrespective of that pronouncement, the Court… intends to impose the middle term of Count 2 … and run that concurrent with the sentence imposed in Count 1."

Neither the prosecutor nor defense counsel addressed the court's findings about section 654.

_____

else?" Sonia said that she heard defendant had done something to his stepdaughter when she was "small," the girl did not say anything about it until she was older because she was scared, and she had moved away. This evidence was not introduced to the jury.

64

Mr. Elia, representing defendant, asked the court to impose the lower term for count I because the case was not as aggravated as other similar cases, and suggested that defendant's "religious conviction is so strong that he truly believes that he has healing powers in his hands," and he gave Sonia a massage that night because he believed she was upset, but his attempts to calm her "went too far."

The prosecutor stated she was "appalled" by defense counsel's attempt to minimize the gravity of the situation given the impact of defendant's conduct on the victim.

Sonia's mother addressed the court and stated that her daughter's life was not normal anymore, she screamed in her bedroom, and she suffered and cried at night because of what defendant did to her.

The court adopted the indicated sentence and imposed the midterm of eight years for count I, with a concurrent midterm of three years for count II, and time served for misdemeanor count III, to run concurrent to the other counts.

*B. Analysis*

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." [Citations.]' [Citation.] Section 954 generally permits multiple conviction. Section 654 is its counterpart concerning punishment. It prohibits multiple punishment for the same 'act or omission.' When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited. [Citations.]" (*People v. Reed* (2006) 38 Cal.4th 1224, 1226–1227.) Section 654 does not allow any multiple punishment, including a concurrent term. (*People v. Deloza* (1998) 18 Cal.4th 585, 592.)

65

At the sentencing hearing, the court addressed count I, sexual penetration of a minor by force in violation of section 289, and count II, sexual battery in violation of section 243.4, and cited one of the definitions within section 243.4: " 'Sexual battery' does not include the crimes defined" in section 261, rape, or section 289, sexual penetration of a minor by force.  (§ 243.4, subd. (g)(2).)  The court appeared to believe that definition precluded application of section 654 to the terms imposed for counts I and II.  However, that definition appears relevant to the determination of lesser included offenses rather than sentencing determinations.

On appeal, the People assert for the first time that defendant actually committed two separate acts of sexual penetration because he committed one act, Sonia pushed him away, and then he committed a second act, such that multiple sentences were appropriate for counts I and II.  The People's argument is based on *People v. Harrison* (1989) 48 Cal.3d 321 (*Harrison*), where the defendant was convicted of three counts of sexual penetration in violation of section 289.  He argued that while he was properly convicted of committing three separate acts of penetration, the court should have stayed two of the three terms under section 654 because "wholly identical sex offenses" were committed in sequence, and he had one criminal objective to achieve sexual gratification.  (*Id.* at p. 336.)  *Harrison* disagreed and held that "no special treatment is to be afforded to a defendant under section 654 simply because he chose to repeat, rather than to diversify or alternate, his many crimes. [Citations.]" (*Id.* at p. 337.)  Section 654 was not applicable because of the defendant's intent "to commit a number of separate base criminal acts upon his victim …." (*Id.* at pp. 337–338.)

There must still be an evidentiary basis to find that section 654 does not apply under the circumstances discussed in *Harrison*.  The trial evidence does not support the People's appellate argument that there were two acts of penetration to avoid application of section 654.  Sonia testified that as defendant moved his hands up her legs; she tried to

66

flick his hand away from her body, but defendant did not stop and continued to move his hands up her legs. When defendant touched her "private part," she again tried to flick his hand away and told him to leave her alone, but defendant did not stop and continued to touch her. While Sonia tried to push defendant away, she testified that she was not successful and she did not interrupt him as he committed the act of penetration.[18] In closing argument, the prosecutor argued to the jury that it should find defendant guilty of count I, sexual penetration of a minor by force, and count II, sexual battery, based on Sonia's testimony that defendant entered her bedroom and his hand "made contact with her vagina," and he "touched the vagina." The prosecutor argued that count III, misdemeanor annoying or molesting a child, was based on defendant's separate conduct of taking advantage of Sonia, his goddaughter, who trusted him like he was her father, and going into her bedroom and touching her in bed. The prosecutor never argued there were two separate acts of penetration.

Based on the entirety of the trial evidence, the court should have stayed the term for count II since it was based on the very same act which was the basis for count I. (See, e.g., *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1007.) In contrast, misdemeanor count III, annoying or molesting a child, was based on defendant's conduct of taking advantage of Sonia from his position of trust, such that section 654 would not apply.

---

[18] As we explained in issue III, *post*, Sonia's testimony on this point does not support *Ngo*'s analysis of whether the jury should have been instructed on attempt as a lesser included offense. In *Ngo*, there was evidence the child's mother interrupted the defendant as he was molesting the victim, thus supporting the attempt instruction. (*Ngo*, *supra*, 225 Cal.App.4th at p. 157.) In contrast, Sonia testified that defendant did not stop when she tried to push his hand away.

The term imposed for count II must be stayed pursuant to section 654. This will not affect defendant's aggregate sentence of eight years since the court imposed a concurrent term for count II.

## **DISPOSITION**

The concurrent term imposed for count II is stayed pursuant to Penal Code section 654. The trial court is directed to prepare an amended abstract reflecting the modification ordered by this court and to forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.